**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **NORA M. BARRAFORD,** | ) | |
| **Individually and as Executrix of the** | ) | |
| **Estate of DANIEL M. BARRAFORD, by** | ) | |
| **her agent THE FEDERAL-MOGUL** | ) | Civil Action No. |
| **ASBESTOS PERSONAL INJURY TRUST,** | ) | 12-cv-10013-FDS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **T&N LIMITED,** | ) | |
| **f/k/a T&N PLC, f/k/a Turner & Newall Plc,** | ) | |
| **and f/k/a Turner & Newall Limited; and** | ) | |
| **TAF INTERNATIONAL LIMITED,** | ) | |
| **f/k/a Turners Asbestos Fibres Limited, and** | ) | |
| **Raw Asbestos Distributors Limited,** | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| **KATHERINE LYDON,** | ) | |
| **Individually and as Executrix of the** | ) | |
| **Estate of JOHN T. LYDON, JR., by** | ) | |
| **her agent THE FEDERAL-MOGUL** | ) | Civil Action No. |
| **ASBESTOS PERSONAL INJURY TRUST,** | ) | 12-cv-10014-FDS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **T&N LIMITED,** | ) | |
| **f/k/a T&N PLC, f/k/a Turner & Newall Plc,** | ) | |
| **and f/k/a Turner & Newall Limited; and** | ) | |
| **TAF INTERNATIONAL LIMITED,** | ) | |
| **f/k/a Turners Asbestos Fibres Limited, and** | ) | |
| **Raw Asbestos Distributors Limited,** | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM AND ORDER ON MOTION FOR JUDGMENT ON THE PLEADINGS AS TO CLAIMS OF PLAINTIFF NORA BARRAFORD

**SAYLOR, J.**

This is a product liability action arising out of alleged asbestos exposure. Jurisdiction is based on diversity of citizenship. In the 1960s and 1970s, Daniel Barraford worked as an electrician and senior engineer on the construction of the Prudential Center in Boston. He died in 2002 as a result of mesothelioma. His widow, Nora Barraford, has brought suit, contending that asbestos products produced by T&N Limited and TAF Limited International caused or contributed to her husband's illness and death.

The complaint asserts six claims: negligence; breach of express and implied warranties; fraudulent concealment; malicious, willful, wanton, and reckless conduct or gross negligence; wrongful death; and loss of consortium. Defendants have moved for judgment on the pleadings on the ground that the limitations period has expired. For the reasons set forth below, the motion will be granted.

## I.  Factual Background

A more extensive discussion of the facts can be found in the Court's September 24, 2013 memorandum and order on defendants' motion for summary judgment. A brief summary of the facts relevant to this motion are included here, presented in the light most favorable to the non-moving party, the plaintiff.

### A.  The Parties

Plaintiff Nora Barraford is the widow and the executrix of the estate of Daniel Barraford. She asserts her claim through her agent, the Federal-Mogul Asbestos Personal Injury Trust (the "Trust"), a Delaware statutory trust.

Defendant T&N Limited, formerly known as Turner & Newall Plc, T&N PLC, and Turner & Newall Limited ("T&N"), and defendant TAF International Limited, formerly known as Turners Asbestos Fibres Limited and Raw Asbestos Distributors Limited ("TAF"), are foreign corporations.

### B.   Daniel Barraford

From the early 1960s to the 1970s, Daniel Barraford worked for the Prudential Insurance Company of America as a senior engineer. He worked on the construction of the Prudential Center in Boston, Massachusetts, which was completed in 1964. Various products that contained asbestos were used to construct the buildings, including Sprayed Limpet Asbestos, a product manufactured and sold by defendants. According to plaintiff, because Daniel Barraford was present on a regular basis at the site while Limpet was being sprayed, he repeatedly inhaled or ingested asbestos fibers.

In September 2002, doctors diagnosed Daniel Barraford with a malignant right pleural mesothelioma. He died on October 23, 2002, of mesothelioma and related complications. Plaintiff alleges that his disease was caused by his exposure to Limpet and other asbestos-containing products.

### C.   Prior Litigation

In 1988, T&N and TAF became a member of the Center for Claims Resolutions, Inc., ("CCR"), a consortium of former asbestos manufacturers.[1] In 1993, the CCR, as defendants' agent, entered into two National Class Action Settlement Agreements. One of those settlements involved a purported class of persons who had been exposed to asbestos and not yet filed suit.

---

[1] For a discussion of the CCR, see generally *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 599-601 (1997).

Daniel Barraford, presumably, was a member of the class, having been allegedly exposed to asbestos in the 1960s. The 1993 settlement agreement, among other things, tolled the limitations period as to the claims of all class members.[2] The district court conditionally certified an opt-out class and appointed as class counsel members of the Ness Motley law firm.

In 1996, the class certification was overturned by the Third Circuit. That action nullified the settlement by its own terms. *See Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3d Cir. 1996), *aff'd sub nom. Amchem Prods. v. Windsor*, 521 U.S. 591 (1997). The class was formally decertified in August 1997.

In July 2000, the CCR and the Ness Motley law firm, which had been appointed as class counsel and which apparently represented a large number of plaintiffs, entered into an agreement.[3] Specifically, they agreed to extend the tolling agreement set forth in the 1993 settlement agreement as to "claims represented by [Ness Motley]." The extension was from May 5, 1996, the date of the Third Circuit's decision in *Georgine*, "until such time" as Ness Motley received "written notification from the CCR that the tolling agreement extension is terminated." (Pl. Opp., Ex. D).[4] There is no evidence that Daniel Barraford or his wife were clients of Ness

---

[2] In 1993 and 1995, Ness Motley and the CCR entered into two other agreements that essentially tolled the statute of limitations for Ness Motley clients who made future claims based on non-malignant diseases against members of the CCR and allowed them to participate in Alternative Dispute Resolution with the CCR in the event that the *Georgine* settlement was overturned. (*See* Pl. Opp., Exs. C, M). The agreements do not appear to apply to plaintiff, because Daniel Barraford was diagnosed with a malignant disease, mesothelioma.

[3] Plaintiff also submitted a copy of a letter dated February 16, 2000, from Joseph Rice of Ness Motley to an individual at the CCR that begins, "Enclosed please find a letter I am proposing concerning our long standing tolling agreement." (Pl. Ex. E). The enclosure does not appear to be part of the record.

[4] The 1993 settlement agreement and the July 2000 letter refer to "T&N plc," but not TAF or any predecessor entities. Both parties appear to assume that T&N and TAF should be treated the same for these purposes.

Motley in July 2000.[5]

On October 1, 2001, Federal-Mogul Global, Inc., and its subsidiaries, which included T&N and TAF, filed a bankruptcy petition under Chapter 11. The bankruptcy petition imposed an automatic stay on all pending claims and litigation against Federal-Mogul and its subsidiaries. (Def. Memo., Ex. B-1 at 3).

The following day (October 2, 2001) Federal-Mogul terminated its membership in the CCR. (Def. Reply, Exs. A, D). The CCR's governing documents provide as follows:

> Upon suspension or termination of membership and thereafter, a Center Member shall have none of the rights or obligations of a Center Member . . . except that, notwithstanding termination of membership, a Center Member . . . shall continue to have and to honor all of the obligations incurred by it hereunder and under the Original Producer Agreement or on its behalf as a Center Member prior to the effective date of its membership termination . . . .

(Def. Reply, Ex. C at 3-4; *see also* Pl. Opp., Ex. L at 9).

One of the assets owned by T&N and TAF was an insurance policy that had been purchased in 1996 from Curzon Insurance Company, called the "Hercules Policy." The parties covered by that policy, including defendants, are referred to as "Hercules Protected Entities" ("HPE"). The Hercules Policy indemnified HPEs for asbestos claims in excess of the "Retained Limit."

As noted, Daniel Barraford was diagnosed with mesothelioma in September 2002, and died in October 2002, after the bankruptcy petition was filed. On October 18, 2004, Nora Barraford, individually and as executrix of the estate of Daniel Barraford, filed an asbestos exposure-related action in Massachusetts Superior Court against thirty defendants. Her

---

[5] Plaintiff is, however, represented in the present action by the successor to the Ness Motley law firm, now called Motley Rice LLC.

complaint did not name either T&N or TAF as a defendant (both were in bankruptcy) and she did not seek relief from the automatic stay in the bankruptcy court in order to do so. There is no evidence that either Daniel or Nora Barraford filed a claim in the bankruptcy proceeding.

The Bankruptcy Court approved a plan of reorganization for Federal-Mogul (the "Plan") that, in part, created a process for handling asbestos-related claims. (Def. Memo., Exs. B, C). Article 4 of the Plan created the Trust. The Plan provided that each holder of an "Asbestos Personal Injury Claim" was deemed to have assigned to the Trust the proceeds of that claim, discharged all other obligations and liabilities of the HPEs to those holders, and appointed the Trust to assert such a claim, now called a "Debtor HPE Asbestos Claim," against the reorganized HPEs, which include T&N and TAF. The Plan, after approval by the District Court, became effective December 27, 2007. (Def. Memo., Ex. E).

### D. Procedural History

On November 22, 2011, the Trust, on behalf of Nora Barraford, filed the present action against defendants T&N and TAF in the Massachusetts Superior Court. On January 4, 2012, defendants removed the action to this Court on the basis of diversity jurisdiction.

The Court entered a scheduling order on November 5, 2012, pursuant to Fed. R. Civ. P. 16. The scheduling order imposed deadlines for certain pre-trial events, including an April 12, 2013 deadline for the filing of dispositive motions. (Dkt. No. 20). Defendants moved for summary judgment on the ground that plaintiff failed to provide sufficient proof of causation. The Court denied the motion on September 24, 2013. (Dkt. No. 37).

## II. Analysis

Defendants have now moved for judgment on the pleadings under Fed. R. Civ. P. 12(c).

Although defendants have moved under Rule 12(c), the exhibits attached to their motion and the facts referred to in their supporting memorandum go well beyond the limited allegations of the complaint and answer.  Under Rule 12(d), courts may treat such motions as motions for summary judgment.[6]  The fact that a party has submitted additional materials outside the pleadings is sufficient notice that the motion will be converted to a summary judgment motion.  *Gulf Coast Bank & Trust Co. v. Reder*, 355 F.3d 35, 38 (1st Cir. 2004).  The decision whether to exclude the materials is within the court's discretion.  *Trans–Spec Truck Serv. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008).

The parties here have had an opportunity to conduct discovery, and plaintiff has responded in full to defendants' motion, and have presented additional evidence outside the pleadings.  Accordingly, the Court will apply the standard of review applicable to motions for summary judgment under Rule 56.

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party may not simply

---

[6] "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).

"rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256–57.

Initially, plaintiff challenges defendants' motion on procedural grounds. Plaintiff contends that because defendants filed this motion long after the April 2013 dispositive motion deadline, the Court should deny it as untimely. This filing is undoubtedly belated; indeed, defendants submitted the motion after the initial pretrial conference, which among other things had the effect of delaying the trial. It would be well within the discretion of this Court simply to deny the motion as untimely. *See Moringlane-Ruiz v. Trujillo-Panisse*, 232 F. App'x 8, 9 (1st Cir. 2007). However, denying the motion on that ground would not resolve the issue; the matter would merely become a question for trial. Such an outcome would be highly inefficient if, as defendants contend, the statute of limitations does in fact bar the suit. Under the circumstances, the Court will decide the motion on the merits.[7]

The parties here agree that the limitations period applicable to plaintiff's claims is three years after accrual of the claim. Mass. Gen. Laws ch. 229, § 2; Mass Gen. Laws ch. 260, § 2A; *Riley v. Presnell*, 409 Mass. 239, 243 (1991). The latest possible date that the limitations period could have begun to run is October 23, 2002, the date of Mr. Barraford's death. Therefore, the limitations period expired on October 23, 2005, at the latest, unless some form of tolling applies.

---

[7] Defendants make the argument that this Court would lack subject-matter jurisdiction over the matter if the claims were barred by the statute of limitations. (Def. Memo. at 6.) That contention is clearly incorrect. It is well-established that the statute of limitations is an affirmative defense. *Fed. Deposit Ins. Corp. v. Cardona*, 723 F.2d 132, 134-35 (1st Cir. 1983). *See Silvestris v. Tantasqua Reg'l Sch. Dist.*, 446 Mass. 756, 766 (2006) (recognizing that the statute of limitations is an affirmative defense that properly is raised in a defendant's answer to the complaint). As such, it "does not affect a court's subject matter jurisdiction." *Vega-Encarnacion v. Babilonia*, 344 F.3d 37, 42 (1st Cir. 2003) (rejecting defendant's argument that limitations period on *Bivens* action had expired thereby relieving district court of subject-matter jurisdiction). *But see Braun v. Yaratz*, 2010 WL 3824109, at *2 (D. Mass. Sept. 24, 2010) (dismissing *pro se* complaint on ground that a district court "lacks subject matter jurisdiction over diversity claims that fall outside the applicable statute of limitations").

Plaintiff contends that the limitations period should be tolled for three reasons: (1) the Bankruptcy Code imposed a stay that has not been lifted; (2) the July 2000 letter agreement between Ness Motley and the CCR tolled the limitations period; and (3) the claim should be subject to equitable tolling.

### A. Bankruptcy Code

When an entity files for bankruptcy, a stay of all legal proceedings automatically goes into effect. 11 U.S.C. § 362. Absent a court granting relief, the stay remains in effect in a Chapter 11 case until the earliest of three enumerated events: (1) "the time the case is closed"; (2) "the time the case is dismissed"; or (3) "the time a discharge is granted or denied." 11 U.S.C. § 362(c)(2)(C).

The confirmation of a plan of reorganization under Chapter 11 "discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A). Usually, such a confirmation also lifts the automatic stay. *McKinney v. Waterman S.S. Corp.*, 925 F.2d 1, 4 (1st Cir. 1991). In place of the stay, a discharge "operates as an injunction against the continuation or commencement" of actions that arose prior to the date of discharge. 11 U.S.C. § 524(a). The bankruptcy court may issue additional injunctions to "supplement the injunctive effect of a discharge" in cases where the plan of reorganization establishes a trust that assumes the debtor's liabilities for asbestos-related tort claims in order to deal equitably with claims and future demands. 11 U.S.C. § 524(g).

While the automatic stay is in effect, new claims against the debtor may arise. To prevent a debtor from avoiding liability for such claims by remaining in bankruptcy until the relevant limitations periods have run, § 108(c) of the Bankruptcy Code provides:

> [I]f applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor . . . and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of—
>
>> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>>
>> (2) 30 days after notice of the termination or expiration of the stay under section 362 . . . of this title . . . with respect to such claim.

11 U.S.C. § 108(c).

Here, defendants filed for bankruptcy on October 1, 2001, triggering the automatic stay. On October 23, 2002, while defendants remained in bankruptcy, Daniel Barraford died. But for the bankruptcy, the three-year limitations period would have expired, at the latest, on October 23, 2005. The bankruptcy court and the district court then confirmed the Plan, effective December 27, 2007, and defendants emerged from bankruptcy. (*See* Def. Memo., Exs. C, D, E).

The parties disagree as to the effect of the confirmation of the Plan on plaintiff's claim.[8] The parties agree that the bankruptcy case was neither closed nor dismissed; the question is whether a discharge was granted or denied. Plaintiff contends that the courts discharged some but not all claims against defendants, and that her asbestos claim is one of the claims that was not discharged. Under that theory, plaintiff asserts that her claim remains subject to the jurisdiction of the bankruptcy court and to the effect of the automatic stay, extending the limitations period through the present day.

Plaintiff reads 11 U.S.C. §§ 108(c) and 362(c)(2) together to provide that an automatic stay will continue "until such time as the *claim* is closed [or] dismissed, or the discharge of the

---

[8] The parties appear to agree that plaintiff's claim here for asbestos-related damages is a "claim" within the meaning of 11 U.S.C. § 101(5).

claim is granted or denied." (Pl. Opp. at 15 (emphasis added)). In fact, § 362 does not refer to "claims," but to "cases"; the automatic stay is terminated when the "case" is closed or dismissed (or a discharge is granted or denied). The bankruptcy court grants "a" discharge, not multiple "discharges," to a debtor. *See In re Cardillo*, 172 B.R. 146, 151 (Bankr. N.D. Ga. 1994) ("Bankruptcy courts do not grant or deny 'a discharge' piecemeal and do not grant or deny 'discharges' to a debtor."); *cf. In re Parker*, 334 B.R. 529, 536 (Bankr. D. Mass. 2005).

The reference to a "claim" in § 108(c)(2) cannot be imported wholesale into § 362. That section addresses extensions of limitations periods when the stay has been terminated or expired; it does not address what *causes* the automatic stay to terminate or expire. The automatic stay can be terminated under § 362(d) as to particular claims—for example, in connection with individual requests for relief from the stay. *See* 11 U.S.C. § 362(d). Thus, if a party is granted relief from the automatic stay under § 362(d) to pursue a cause of action against the debtor, then the 30-day time period under § 108(c)(2) would begin to run "with respect to such claim." But § 108(c)(2) does not change the meaning of § 362, or create or extend the stay itself.

It is true that the bankruptcy court here retained jurisdiction over the case. But its jurisdiction was limited to overseeing the implementation of the Plan. And the language of the Plan is not to the contrary, although some discussion is required to explain why. Article 4 of the Plan established the Trust and a process for adjudicating pending and future asbestos-related claims against defendants. (Def. Mem., Ex. C, Art. 4). From the effective date of the Plan until the later of the "Hercules Policy Expiry Date" and the "EL Asbestos Insurance Expiry Date" (essentially, the date when the insurance and other assets run out), defendants retained liability for such claims, termed Asbestos Personal Injury Claims, but with the ability to assert any

defenses and with recourse only to certain assets. *Id.* §§ 4.5.6, 4.5.8, 4.5.10. The Plan assigned such claims from injured persons to the Trust, appointed the Trust to assert the claims, and gave those injured persons a right to make a demand upon the Trust. *Id.* §§ 4.5.8-10. The court entered a channeling injunction to ensure compliance with those procedures pursuant to § 524(g). (Def. Mem., Ex. E). *Cf. In re W.R. Grace & Co.*, 475 B.R. 34, 94-108 (D. Del. 2012) (discussing channeling injunctions).

Somewhat confusingly, the Plan states that on the later of the Expiry Dates, defendants will automatically "be *discharged* and released from any and all liability with respect to Asbestos Personal Injury Claims," for which the Trust will then assume liability. (Def. Mem., Ex. C, § 4.5.20 (emphasis added)). Plaintiff reads this subsection to mean that her claim has not been discharged, and that therefore the automatic stay remains in effect. However, it does not necessarily follow that because defendants may still be liable, a discharge under the Bankruptcy Code did not occur in December 2007, when the plan was confirmed. At the very least, the Plan both denied a discharge with respect to Debtor HPE Asbestos Claims up to the availability of the Hercules Policy and granted an automatic discharge with respect to such claims upon the occurrence of the Hercules Policy Expiry Date. Under the Plan, no further court order was necessary for the full discharge of all claims to be in effect.

The imposition of a channeling injunction is a clear indication that a discharge was granted or denied and the automatic stay lifted. Section 524(g) states that "a court that enters an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction in accordance with this subsection to supplement the injunctive effect *of a discharge* under this section." 11 U.S.C. § 524(g) (emphasis added). In other words, an

injunction may be put in place in conjunction with a discharge. An injunction would be unnecessary if the automatic stay were still in place. Furthermore, it is noteworthy that plaintiff has not acted as if the automatic stay is still in place; the Trust was not required to, and did not, seek leave of the Bankruptcy Court before filing this action.

In short, as of December 27, 2007, the effective date of the Plan, defendants were granted a discharge and the automatic stay was lifted. Because the limitations period for plaintiff's claim had expired while defendants were in bankruptcy, plaintiff had thirty days from December 27, 2007, to file suit, under the provisions of the Plan, unless another nonbankruptcy law or agreement extended the period to file. 11 U.S.C. § 108(c)(2). Plaintiff did not file this action until November 2012, nearly five years after that thirty-day window expired. Accordingly, the Bankruptcy Code does not operate to save plaintiff's claims from dismissal on statute of limitations grounds.

### B. Tolling Agreement

If the Bankruptcy Code itself did not extend the time to file, plaintiff contends that the CCR-Ness Motley tolling agreement does.[9] The agreement is embodied in a July 17, 2000 letter, signed by Michael F. Rooney on behalf of the CCR and attorney Joseph Rice of Ness Motley. It provides as follows:

> This letter confirms and memorializes that the CCR defendants . . . , by and through the CCR, agreed to extend the tolling agreement contained in Section VI

---

[9] Contrary to defendants' reading of plaintiff's opposition (Def. Reply at 7), the Court does not understand plaintiff to be arguing that the 1993 settlement agreement applies here to toll the limitations period. (*See* Pl. Opp. at 11-13). Instead, the information appears to be background for interpreting the 2000 tolling agreement. However, to the extent that plaintiff does assert that the 1993 settlement agreement remains in effect, that is incorrect. By its own terms, the obligations under the agreement ceased when the Third Circuit, affirmed by the Supreme Court, overturned the judgment approving the stipulation. (*See* Pl. Opp., Ex. B at 102-03). *See Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3d Cir. 1996) *aff'd sub nom. Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).


of the Stipulation of Settlement as to claims represented by [Ness Motley] from May 5, 1996, the date of Georgine v. Amchem Products, Inc., 83 F.3d 610 (3rd Cir. 1996). This letter further confirms and memorializes that this agreement to extend the tolling agreement continues until such time as [Ness Motley] receives written notification from the CCR that the tolling agreement extension is terminated.

(Pl. Opp., Ex. D). The agreement as a whole is brief. It does not specify which "claims" Ness Motley represented. And it does not address the effect of an individual member's withdrawal from the CCR.[10]

The phrase "claims represented by [Ness Motley]" is unclear at best. Attorneys represent clients, not claims. Neither Nora nor Daniel Barraford was a client of Ness Motley in July 2000, or for that matter at any point between May 1996 and July 2000. Under the 1993 settlement and the *Georgine* district court's class-certification decision, Ness Motley attorneys were class counsel representing a class of persons with future claims—which would appear to include the Barrafords. *See Georgine*, 83 F.3d at 616, 619. But as of 1996, when that settlement was overturned, and 1997, when that class was decertified, Ness Motley no longer represented a class of persons. At that time, the firm only represented certain specific individual clients, which did not include either Nora nor Daniel Barraford. At most, Ness Motley could enter into a tolling agreement only as to their own clients, not as to the no-longer-existing class. Put simply, that law firm had no authority to act on behalf of the Barrafords in July 2000.

The letter does not indicate the effect of a defendant's withdrawal from the CCR.[11] The

---

[10] The task of the Court in resolving these ambiguities is made more difficult because the parties do not suggest which state's law should be applied to interpret the agreement. However, it suffices for present purposes to apply generally-accepted principles of contract law.

[11] The February 16, 2000 letter from attorney Rice to the CCR about the "long standing tolling agreement" states that he will "contact the withdrawing members of the CCR," "ask them if they wish to continue the tolling or should [he] deem it terminated as to those defendants," and "then take legal action . . . as we deem appropriate." (Pl. Opp., Ex. E). Although defendants here were not the withdrawing members referred to in the letter, this language

governing document for the CCR provides grounds for terminating membership, and states as follows:

> Upon termination of membership and thereafter, a Participating Producer shall have none of the rights or obligations of a member of the Center . . . .  However, notwithstanding termination of membership, a Participating Producer shall continue to have and to honor all of the obligations incurred by it hereunder or on its behalf as a member prior to the effective date of its membership termination, including any retroactive adjustments of its percentage shares of liability payments and allocated expenses . . . .

(Pl. Opp., Ex. L).  It is arguable that the tolling agreement, to the extent it exists, is an "obligation" of defendants incurred "on [their] behalf as a member."  But, as noted, the tolling agreement did not cover the Barrafords.  And defendants here withdrew from the CCR in October 2001, before the wrongful-death claim had even accrued.  Furthermore, the use of the word "incur," which has a financial connotation, and the examples of financial obligations to the CCR, suggest that only those types of obligations and not all contracts will continue.  It is at the very least doubtful whether the tolling agreement, if any, survived defendants withdrawal from the CCR.  In any event, there is no tolling agreement extending the limitations period as to plaintiff's claims.

### C.    Equitable Tolling

Finally, plaintiff contends that applying the statute of limitations here would be inequitable because defendants were aware, when they sought bankruptcy protection, that many persons in her situation would be delayed in pursuing their claims.  (Pl. Opp. at 23-24).  She therefore urges the Court to apply principles of equitable estoppel to preclude defendants from asserting a statute of limitations defense.

---

also suggests that the tolling agreement as to defendants' did not survive their later withdrawal.

The doctrine of equitable tolling extends deadlines "if a plaintiff exercising reasonable diligence could not have discovered information essential to the suit." *Bernier v. Upjohn Co.*, 144 F.3d 178, 180 (1st Cir. 1998) (*citing Protective Life Ins. Co. v. Sullivan*, 425 Mass. 615 (1997)).  It operates to prevent "results contrary to good conscience and fair dealing." *McLearn v. Hill*, 276 Mass. 519, 524 (1931).  That said, "[t]he law does not regard estoppels with favor, nor extend them beyond the requirements of the transactions in which they originate." *Boston & Albany Railroad v. Reardon*, 226 Mass. 286, 291 (1917).

Here, the evidence demonstrates that Nora Barraford was aware of the basic underlying facts of her claim by October 23, 2002, at the latest.  Indeed, she filed an asbestos-related lawsuit in state court against other parties out of the same core set of facts in 2004.  While she could not have filed a suit against T&N and TAF at that time, due to the bankruptcy, she has presented no evidence that defendants misled her to prevent her from filing suit, or that she was otherwise prevented from timely doing so when defendants emerged from bankruptcy.

Accordingly, the doctrine of equitable tolling will not be employed to extend the limitations period for plaintiff's claims.

### III.    Conclusion

For the foregoing reasons, defendants' motion for judgment on the pleadings is GRANTED.

**So Ordered.**

Dated:  February 25, 2014

 /s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge